United States District Court
Southern District of Texas

**ENTERED**

November 20, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ROGELIO DELACERDA, | § | |
| TDCJ # 01608378 | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-3557 |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Texas state inmate Rogelio Delacerda, representing himself, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2009 Texas conviction and sentence for murder. (Docket Entry No. 1). The respondent has answered and filed a copy of the state court record. (Docket Entry Nos. 9, 10). The respondent asserts that the petition must be dismissed because it is without merit. (Docket Entry No. 10). Delacerda has not responded to the respondent's answer. Based on the pleadings, the answer, the record, and the applicable law, the court denies the petition for a writ of habeas corpus. The reasons are explained below.

## I.    Background and Procedural History

### A.    Factual Background

Delacerda challenges his conviction for the murder of Jesus "Robert" Contreras. On direct appeal, the intermediate state court of appeals summarized the relevant facts as follows:

> On January 21, 1997, the complainant, seventeen year old Jesus "Robert" Contreras, was walking home from Stephen F. Austin High School in southeast Houston with his twin brother, Albert, and their friends, Gene Cantu, Raul Rodriguez, Chris Aviles, and Julio Lara. As the group walked home on Dumble Street, a newer-model navy blue truck drove past. Albert Contreras testified that he saw three people inside the truck—a male driver, a male passenger, and a female

sitting in between—and one person lying in the truck bed, who kept "popping his head up."  Albert stated that he recognized the person in the back of the truck as someone whom he had seen around school two or three times, but he did not know his name.  Albert testified that no one in his group said anything to the truck's occupants as they drove past, but the truck stopped and the passenger looked at the boys after the truck had driven by.  Albert did not recognize the passenger as a fellow student.

The truck continued down Dumble and turned right onto Polk Street.  As the boys crossed the intersection of Dumble and Polk, Albert saw that the truck had stopped and the person in the back of the truck was speaking to the people in the truck's cab.  Albert testified that the truck made a U-turn and turned back onto Dumble, driving in the same direction that the boys were walking, and passed the boys as they reached a tire shop.  At the tire shop, the passenger pulled out a gun and shot approximately five or six times at the group.  After the passenger stopped shooting and the truck drove away, Albert looked for his brother and found him underneath a piece of plywood, leaning against the wall of the tire shop.  Robert had a gunshot wound to his left lower back and died later that night at the hospital.  Albert testified that neither he nor his brother was involved in a gang and that neither of them had had any altercations with other students at school in the week before the shooting.  The State did not ask Albert on direct examination whether he viewed a police photospread or whether he identified anyone in that photospread.

. . .

Raul Rodriguez testified that he recognized the passenger as someone with whom he thought he had gone to middle school, and he stated that, although the passenger was Hispanic, he had distinctive "Asian-looking" eyes.  Raul acknowledged that, at the time of the shooting, he, Julio, who was shot in the leg during this altercation, and Gene were all members of a neighborhood gang called PSV, located in the Second Ward.  To Raul's knowledge, neither Robert nor Albert Contreras was a member.  At trial, Raul identified [Delacerda] as the shooter.

Carlos Martinez, who also attended school with Robert and his friends, testified that after school on the day of the shooting he met up with his friends, David Cruz and Tommy Barron, to get a ride home.  He testified that, as they were waiting for their ride, David showed them a gun that he had in his waistband.  Carlos stated that David's cousin picked them up in a truck and that he was accompanied by a male passenger and a female sitting in between; Carlos did not know any of the people in the truck.  Carlos testified that he, David, and Tommy all jumped in

the back of the truck and lay down.  At one point, Carlos heard someone in the front of the truck ask David "Is that them?" and he heard David reply, "I think so." Carlos did not look to see to whom they were referring.  While they were in the truck, Carlos saw David hand a gun to the passenger. Carlos testified that he was scared and did not know what was about to happen.  Carlos then testified that he heard the passenger ask David "if he wanted [the passenger] to shoot at him," and after David responded, "I don't know," Carlos heard gunshots.  Carlos stated that no one in the bed of the truck fired a gun.

After the shooting, the driver dropped the boys off at a park, and the passenger handed the gun to David. Carlos stated he had no idea that a shooting was going to happen and that he "caught a ride with the wrong people that day." Carlos testified that when he initially spoke to the police he told them that David was the shooter because David had told Carlos and Tommy that he "didn't want nobody to take the blame for him."  However, later on the same day that he gave this statement, Carlos told police that the passenger was the shooter.

On cross-examination, Carlos stated that he knew David had been having trouble with PSV members and that David had a gun with him on the day of the shooting.  He also stated that, after they were already in the back of the truck, he heard David say, "Now you're going to learn about drive-bys."  Carlos testified that he knew what this meant but that it was too late for him to get out of the truck. Carlos also testified that, the Friday before the shooting, David had told Tommy that he and his friend had been beaten up by PSV members and that David was going to "pop a cap at," or shoot, those involved.  Carlos further testified that after he had given his first statement to police, in which he named David as the shooter, he asked the officer driving him home what would happen if he had lied in his statement and the officer replied that he would be in "big trouble."  At this point, Carlos decided, on his own, to "tell the truth" because he did not want to get into trouble.  When Carlos spoke to the officers a second time, he named [Delacerda] as the shooter.

David Cruz testified that on the Friday before the shooting he and one of his friends were walking home when they were "jumped" by approximately twenty to thirty PSV members.  After this incident, David called his cousin, Jose Carreon, told him that he was having problems with people from school, and asked Jose if he could take him home from school the next week.  On Saturday, Jose and [Delacerda] came to David's house to talk about the situation and to offer advice and support.  David testified that [Delacerda] gave him a gun "for protection." David brought the gun to school on Tuesday, January 21, and showed it to his friend

Edgar, who had been involved in the incident on the previous Friday.  David could not recall if he showed the gun to anyone else.  He stated that right before school let out on Tuesday he had another altercation and was chased by a group of unnamed boys.

David testified that Jose, accompanied by his girlfriend, Emily Hugo, who owned the truck, and [Delacerda], picked him up from school.  When they arrived, [Delacerda] asked David for the gun, and, after he handed it over, David climbed in the back of the truck with Tommy and Carlos.  David stated that the three boys were lying down in the back because they did not want other students to see where they lived, and he gave directions to Jose while lying down.  After Jose turned onto Polk, David informed him that he was going the wrong way to his house, and Jose turned back onto Dumble.  After Jose turned, David testified that he heard a group of PSV members throwing things at the truck and that he heard [Delacerda] talking to them.  [Delacerda] then asked David "if that was them," and, after David responded that it was not, [Delacerda] started shooting "on his own."  David testified that he had only brought the gun to school to scare the people who were harassing him and that he did not want the situation to escalate to the point of a shooting.

David stated that, after the shooting, Jose started arguing with [Delacerda] and Emily was angry and crying.  Jose then drove to a park and dropped off David, Tommy, and Carlos.  [Delacerda] got out as well, told David and the boys to "keep [their] mouths shut," and handed David the gun.  David testified that all three boys were scared and that he told the others to say that he was the shooter "so someone else won't go down for [David's] problems."  David stated that he kept the gun at his house for approximately three days before [Delacerda] came and picked it up "so [they] wouldn't get caught."  He further testified that he gave a statement to the police on January 29, 1997, and he told them that [Delacerda] was the shooter.

On cross-examination, David testified that he did not remember telling Carlos and Tommy before they got in the truck that "today, they [were] going to learn about drive-bys."  He further stated that he had seen [Delacerda] and Jose together on several occasions and that [Delacerda] had been to his house "a lot of times."

Emily Hugo testified that, on January 21, Jose drove her back to their school, Cy–Falls High School, so she could attend after-school tutorials.  When they arrived at school, she went inside to call her father and to check a voicemail that Jose had received from David on his pager.  As Emily was walking back to her

truck to tell Jose that David had requested a ride home, [Delacerda] asked her if she could give him a ride home.  Emily testified that, when they arrived at David's school, [Delacerda] got out of the truck and then sat back down in the passenger seat, and David and his friends climbed into the back of the truck and remained there.  Emily did not see David hand [Delacerda] a gun, and she did not remember hearing any conversations in the truck between David and [Delacerda].

Emily testified that, at one point, a group of kids walking on Dumble started yelling at the truck and [Delacerda] started yelling back.  Immediately afterwards, Emily saw [Delacerda] pull a gun from his waistband and start shooting at the group of kids.  Emily testified that, after the shooting, she started crying and was in shock.  After Jose dropped David and his friends off, Jose, Emily, and [Delacerda] drove back across Houston to pick up Emily's younger sister from school.  Emily stated that she did not kick [Delacerda] out of the truck at that point because she was scared and "didn't know what to do."  When they dropped [Delacerda] off at his house, he told Emily and Jose not to tell anyone what had happened.

. . .

Delacerda testified on his own behalf during the guilt-innocence phase.  He acknowledged that he had been a member of the Latin Kings gang from 1994 to 1996, before the shooting occurred.  He testified that he had never been to David Cruz's house, that he had only seen David once or twice before the shooting, that he did not give David a gun, that he never had a gun on the day of the shooting, and that he did not go to David's house after the shooting to retrieve the gun.  Delacerda stated that when he, Jose, and Emily arrived at David's school David showed them a gun and that David sat in the passenger seat while Delacerda climbed into the back of the truck with David's two friends.  Delacerda testified that he heard David say, "Duck, because y'all are going to see what a drive by is," and, when the shooting started, he was lying in the back of the truck, covering his head.  [Delacerda] stated that, after Jose dropped him off at his house, Jose told him that he had better not say anything, "or else."  [Delacerda] denied making threats to Jose and David.  [Delacerda] also testified that, after the shooting, he was "scared for his life," and he left Houston for Mexico and stayed there for five or six years.

*Delacerda v. State*, 425 S.W.3d 367, 373–78 (Tex. App.—Houston [1st Dist.] July 21, 2011, pet. ref'd) (internal footnotes omitted).

### B.    The State Court Proceedings

Delacerda was indicted in August 2009 in Cause Number 1229727 for the murder of Contreras. (Docket Entry No. 9-36 at 334). After a trial in October 2009, a jury found him guilty. (*Id.* at 336–37); *see also Delacerda*, 425 S.W.3d at 378. The intermediate state court of appeals described the State's presentation during the punishment phase of trial as follows:

> At the punishment phase, the State called Harris County Sheriff's Department Deputy M. Squyres as an expert on criminal street gangs. Before Deputy Squyres testified, defense counsel objected to any testimony regarding the national criminal activities of the Latin Kings unless the State could specifically connect such activity to [Delacerda]. The trial court overruled the objection, agreeing with the State that the nature of the Latin Kings and the kinds of activities for which they are known was "highly relevant" to [Delacerda]'s character. Deputy Squyres testified that the Latin Kings are known for engaging in criminal activity, specifically narcotics distribution, "random assaultive behavior against other gang members," and murder. Deputy Squyres also testified that he examined and photographed [Delacerda]'s tattoos, and two of them shared characteristics with common Latin Kings gang symbols. Deputy Squyres noted that one of those tattoos was dated March 1, 2002.

*Delacerda*, 425 S.W.3d at 378. As a mitigation witness, the defense called Delacerda's wife, Yadira Delacerda. (Docket Entry No. 9-3 at 74). Yadira testified that she has been with Delacerda for twelve years and that he has never gotten into trouble with the law during that entire time. (*Id.* at 74–75). She also testified that they lived both in Mexico and in the United States during their marriage and that Delacerda has had a couple of different jobs. (*Id.* at 74–75). She testified that Delacerda changed jobs for opportunities to earn more money. (*Id.* at 75). On cross-examination, Yadira admitted that when she first met Delacerda, which was in Mexico, he was using an alias. (*Id.* at 76).

During closing argument, the State asked the jury to sentence Delacerda to no less than 50 years in prison. (Docket Entry No. 9-3 at 80). Ultimately the jury sentenced Delacerda to 35

years.  (Docket Entry No. 9-36 at 336–37); *see also Delacerda*, 425 S.W.3d at 378.  In July 2011, the First Court of Appeals affirmed Delacerda's conviction, and in September 2014, the Texas Court of Criminal Appeals refused his petition for discretionary review.  *See Delacerda*, 425 S.W.3d at 403; (Docket Entry No. 9-13).

Delacerda submitted a state application for a writ of habeas corpus in October 2015.  (*See* Docket Entry No. 9-36 at 18).  After factual development, including the submission of affidavits from Delacerda's trial and appellate attorneys, in December 2021 the state district court judge issued a 39-page order on the state habeas application, recommending that relief be denied.  (*Id.* at 194–232).  In August 2022, the Texas Court of Criminal Appeals denied the application, without written order, on the findings of trial court after hearing and on the court's independent review of the record.  (Docket Entry No. 9-29).

### C.    Petitioner's Federal Habeas Petition

Delacerda's federal habeas petition asserts the following claims:

(1) Trial counsel provided ineffective assistance during the guilt-innocence phase of trial by:

>    (a) failing to object to the in-court identification of Delacerda by Raul Rodriguez;

>    (b) failing to request a jury charge on the lesser included offense of manslaughter;

>    (c) failing to object to the trial court's lack of personal or subject matter jurisdiction over Delacerda.

(2) Trial counsel provided ineffective assistance during the punishment phase of trial by:

>    (a) failing to offer testimony from character/mitigation witnesses who were available, able to, and willing to testify, and instead presented evidence from only one witness (Delacerda's wife); and

(b) failing to conduct an investigation of Delacerda's background or present mitigation evidence of Delacerda's family and employment history.

(3) The trial court lacked jurisdiction because the transfer order from the juvenile court was void.

(Docket Entry No. 1).[1]

The respondent has filed an answer in response to the § 2254 petition, arguing that Delacerda's claims should be dismissed because the claims are without merit. (Docket Entry No. 10). Delacerda has not responded.

## II.    The Applicable Legal Standards

### A.    The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas corpus is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Woodford v. Garceau*, 538 U.S. 202, 205–08 (2003). Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7–8 (2002) (quoting 28 U.S.C. § 2254(d)); *Cobb v. Thaler*, 682 F.3d 364, 372–73 (5th Cir. 2012) (same). "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08 (2002)). To constitute an "unreasonable application of"

---

[1] To facilitate a more orderly analysis, the court has organized Delacerda's claims slightly differently than Delacerda presents them in his petition.

clearly established federal law, a state court's holding "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

When a claim concerns a question of fact, the AEDPA precludes federal habeas relief unless the state court's adjudication of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *see also Martinez v. Caldwell*, 644 F.3d 238, 241–42 (5th Cir. 2011). A state court's factual determinations are "presumed to be correct" unless the petitioner rebuts those findings with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness extends not only to express factual findings, but also to implicit or "unarticulated findings which are necessary to the state court's conclusion of mixed law and fact.'" *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001)). A federal habeas court "may not characterize these state-court factual determinations as unreasonable 'merely because [it] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "Instead, § 2254(d)(2) requires that [a federal court] accord the state trial court substantial deference." *Id.* This court may consider only the factual record that was before the state court in determining the reasonableness of that court's findings and conclusions. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

When a claim challenges a mixed question of fact and law, the state court's determinations are entitled to deference "unless the findings were 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.'" *Martinez*, 644 F.3d at 242 (quoting § 2254(d)(1)). Generally, federal courts presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting that same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999) ("When faced with a silent or ambiguous state habeas decision, the federal court should 'look through' to the last clear state decision on the matter."). When, however, "a state court's decision is unaccompanied by an explanation," and the lower courts did not issue a reasoned opinion, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98; *see also Salts v. Epps*, 676 F.3d 468, 480 n.46 (5th Cir. 2012) ("[W]here a state court summarily denies a petitioner's motion, and provides no statement of its reasons, 'the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'") (quoting *Harrington*, 562 U.S. at 98).

## B.    Self-Represented Litigants

Delacerda represents himself. This court is required to construe petitions filed by self-represented litigants liberally. *See Hernandez v. Thaler*, 630 F.3d 420, 426 (5th Cir. 2011) ("The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to the benefit of liberal construction.") (citations omitted); *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001) ("[Petitioner]'s pro se application for habeas relief is entitled to liberal construction.") (citations omitted). Pleadings by *pro se* litigants are held "to less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

### III.    Discussion

#### A.    The Claim That the Trial Court Lacked Jurisdiction to Adjudicate the Case

In this ground for relief, Delacerda argues: "Delacerda was a juvenile on the date of the offense.  The juvenile court waived jurisdiction and transferred the case to a felony criminal district court of Harris County, Texas for prosecution.  The juvenile court transfer order was void and failed to confer jurisdiction to the adult felony criminal district court."  (Docket Entry No. 1 at 7).

Challenges to state law are not cognizable in a federal habeas corpus proceeding.  *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) ("[F]ederal habeas corpus relief does not lie for errors of state law.") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)); *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011) ("Under § 2254, federal habeas courts sit to review state court misapplications of *federal* law.  A federal court lacks authority to rule that a state court incorrectly interpreted its own law.") (emphasis in original).  To the extent Delacerda is alleging a federal constitutional right to be tried as a juvenile, no such right exists.  *See, e.g.*, *United States v. Juvenile*, 228 F.3d 987, 990 (9th Cir. 2000) ("There is no constitutional right to be tried as a juvenile . . . .") (citations omitted); *Penn v. Att'y Gen. of State of Ala.*, 930 F.2d 838, 843 (11th Cir. 1991) ("[T]here [is] *no* constitutional or statutory right for a youth between sixteen and eighteen years old to be tried as a juvenile.") (emphasis in original); *Broadway v. Beto*, 338 F. Supp. 827, 840 (N.D. Tex. 1971) ("A person has no constitutional right to be tried as a juvenile at any certain age.") (citation omitted), *aff'd sub nom. Broadway v. State of Texas*, 459 F.2d 483 (5th Cir. 1972).

Delacerda is not entitled to habeas relief on this claim.

#### B.    The Ineffective Assistance of Counsel Claims

Ineffective assistance of counsel claims are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, a petitioner must demonstrate both constitutionally

deficient performance by counsel and actual prejudice to the defense as a result. *See Strickland*, 466 U.S. at 687. "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable." *Id.* Failing to show either deficient performance or prejudice is fatal to an ineffective assistance claim. *See id.*; *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998). "Like AEDPA, *Strickland* establishes a deferential standard," and in order to prevail on an ineffective assistance of counsel claim in a § 2254 proceeding, a petitioner "must prove both that his counsel's performance was objectively deficient and that his counsel's deficiency prejudiced him, and that no reasonable jurist could conclude otherwise." *Williams v. Thaler*, 684 F.3d 597, 604 (5th Cir. 2012); *see also Harrington*, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

To demonstrate deficient performance, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Harrington*, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing *Strickland*, 466 U.S. at 690). This is a "highly deferential" inquiry, in which "counsel is strongly presumed to have rendered adequate assistance" and that the challenged conduct was the product of reasoned trial strategy. *Strickland*, 466 U.S. at 689–90; *see also Pape v. Thaler*, 645 F.3d 281, 292 (5th Cir. 2011). To overcome this presumption, a petitioner must identify counsel's acts or omissions that did not result from reasonable professional judgment. *Strickland*, 466 U.S. at 690. Counsel's error, even if professionally unreasonable, does not warrant setting aside a conviction if the error had no effect

on the outcome. *Id.* at 691 (citation omitted). To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "In short, a petitioner cannot demonstrate prejudice by showing that, but for counsel's deficient performance, he would have been entitled to a new trial under state law. Rather, a petitioner must also demonstrate that counsel's deficient performance rendered the result of his trial unreliable or the proceeding fundamentally unfair." *Green*, 160 F.3d at 1043 (internal citation omitted).

The state habeas court considered and rejected Delacerda's ineffective assistance of counsel claims. "[T]he test for federal habeas purposes is *not* whether [the petitioner] made [the showing required by *Strickland*]." *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003). "Instead, the test is whether the state court's decision—that [the petitioner] did *not* make the *Strickland*-showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim." *Id.* A petitioner's conclusory allegations of ineffective assistance of counsel will fail to rebut a state court's finding that his counsel was not deficient or that he was not prejudiced by his counsel's performance. *See Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983). "An assertion is conclusory if it relies on inferences without also setting forth the facts that support those inferences." *Favela v. Collier*, No. 22-40415, 91 F.4th 1210, 1213 (5th Cir. Jan. 31, 2024) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 898–99 (1990) and Black's Law Dictionary (11th ed. 2019)).

### 1. The Claim of Counsel's Failure to Request that the Lesser Included Offense of Manslaughter be Included in the Jury Charge

Delacerda asserts that his trial attorney provided ineffective assistance during the guilt-innocence phase of trial by failing to request a jury instruction on the lesser included offense of

manslaughter, which Delacerda asserts was supported by the evidence.  (*See* Docket Entry No. 1 at 11).

A decision to forego asking for a specific jury charge is strategic in nature.  Strategic choices made by counsel are entitled to substantial deference when reviewed by a federal habeas court.  The Fifth Circuit has repeatedly held that "a conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008) (citations omitted); *see also United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed.") (citation omitted).  Due to "the almost infinite variety of possible trial techniques and tactics available to counsel, [a court] is careful not to second guess legitimate strategic choices." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993).

"Under Texas law, there is a two-step test to determine whether a lesser included offense instruction should be given: first, the lesser included offense must be within the proof necessary to establish the offense charged; second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser offense." *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009); *see also Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023).

In rejecting this claim on collateral review, the state habeas court made the following relevant findings:

**B.  Trial counsel's performance was not deficient for not requesting a jury charge on the lesser included offense of manslaughter, which was raised by the evidence.**

1. [Delacerda] was indicted for murder.  The evidence at trial was undisputed that an occupant of a truck fired a gun in the direction of a group of young males, resulting in the death of the complainant.

2.  A defendant is entitled to an instruction on a lesser included offense when the proof for the offense charged includes the proof necessary to establish the lesser included offense and there is some evidence in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser included offense. *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Id.*

3.  The evidence presented at trial will support a lesser included offense instruction when it establishes a "valid rational alternative" to the charged offense. *Wortham v. State*, 412 S.W.3d 552, 557 (Tex. Crim. App. 2013).

4.  A conviction for manslaughter requires a finding that the defendant recklessly caused the decedent's death. Tex. Pen. Code Ann § 1904 (Vernon 2003). "A person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregard [sic] a substantial and unjustifiable risk that . . . the result will occur." Tex. Pen. Code Ann § 603(c).

5.  A manslaughter charge is required if there is any evidence from which a jury could conclude the defendant did not intentionally or knowingly kill an individual, but consciously disregarded a substantial and unjustifiable risk that the result would occur. *Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984). "[A] defendant may be shown to be guilty only of the lesser offense if the evidence presented is subject to different interpretations." *Saunders v. State*, 840 S.W.2d 390, 392 (Tex. Crim. App. 1992). Moreover, it is immaterial whether the evidence fits within the larger theme of the defendant's testimony, whether it was admitted by the State or the defense, or whether it is "strong or weak, unimpeached or contradicted*." Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998).

6.  Manslaughter is a lesser included offense of murder. *See Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003).

7.  The evidence clearly established that the shooter fired several shots from a moving vehicle toward a group of individuals. If the shooter was [Delacerda], as found by the jury, there is some evidence that he acted recklessly and that the jury could have rationally found that [Delacerda] was guilty only of manslaughter. *See Shanklin v. State*, 190 S.W.3d 154, 160 (Tex. App.—Houston [1st Dist.] 2005).

8.  [Delacerda] was entitled to an instruction on the lesser included offense of manslaughter.

9.  The evidence did raise the lesser-included offense of manslaughter, which would have capped [Delacerda]'s sentence at 20 years. Had the jury harbored reasonable doubt concerning the defendant intentionally or knowingly causing the death of the complainant, the jury would have been permitted to consider whether [Delacerda] was guilty of manslaughter or deadly conduct.

10.  Trial counsel's failure to request a jury instruction on the lesser offense of manslaughter did not necessarily render his performance deficient under the first prong of *Strickland.*

11.  The Court finds, based on a review of the appellate record and the credible affidavit of R.P. Cornelius, that Cornelius presented the theory in the defense case-in-chief that [Delacerda] never possessed or shot a firearm during the incident.  (III R.R. 13–14).

12.  The Court finds that both the State and Defense represented to the court during their charge conference that the alleged shooter was not intending to fire at the complainant, Jesus Roberto Contreras.  The State contends that [Delacerda] was intending to fire at a particular person and struck the complainant instead; the defense contended there was no evidence that the shooter was trying to hit a particular person at the time the gun was fired.  *See*, 7 RR, p. 81, line 25; p. 82, lines 1–25.

13.  The Court finds that there was evidence during the trial (*Emily Hugo's testimony*) that [Delacerda] fired into a group.  *See*, RR.

14.  Clearly, the exchange between the parties during the charge conference regarding "*transferred intent*" and the Defense's argument against putting the definition of "*transferred intent*" into the charge indicates the Defense wanted to ensure the State was held to the burden of proving the defendant intentionally or knowingly fired at a particular person and not in the direction of a crowd since the evidence strongly suggested the latter.

15.  The Court finds attorney Cornelius to be skilled and knowledgeable of the State's burden of having to prove the *mens rea* as charged in the indictment.  *See*, *Affidavit of Attorney Cornelius*.

16.  The Court finds Cornelius not requesting to have the lesser-included offense of manslaughter included in the charge was a strategic maneuver considering the foregoing exchange at the charge conference, the defensive theory of the case—*that [Delacerda] was not the shooter*, and Defense's argument that the State had no evidence to show "intent" to harm a particular person.  As such, the defense strategy would be an "*all or nothing*" scenario when the jury rendered its verdict.

17.  **The Court finds that Attorney Cornelius was not ineffective in his representation of [Delacerda] when he did not ask for the lesser-included offense in the charge**.  See, *Shanklin v. State*, 190 S.W.3[d] 154, 160 (Tex. App.—Houston [1st Dist.] 2005).  ("*We assumed a strategic motive if any can be imagined; and we find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it*.")  *Id.* (citing, *Bone v. State*, 77 S.W.3d 828, 833 –34 n.13 (Tex. Crim. App. 2002).

16

(Docket Entry No. 9-36 at 206–09).

The court's job in considering a federal habeas petitioner's ineffective assistance of counsel claim is not to determine "whether [the petitioner] made [the showing required by *Strickland*]." *Schaetzle*, 343 F.3d at 444. "Instead, the test is whether the state court's decision— that [the petitioner] did *not* make the *Strickland*-showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim." *Id.*

As thoroughly analyzed by the state habeas court, defense counsel not requesting that the lesser-included offense of manslaughter be included in the jury charge was strategic. For defense counsel to argue that Delacerda was guilty of only the lesser-included offense would have been inconsistent to the defense theory that Delacerda was not the shooter.

Delacerda has failed to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland*, or was an unreasonable determination of the facts based on the evidence in the record. The respondent is entitled to dismissal of this claim.

### 2. The Claim of Counsel's Failure to Object

First, Delacerda alleges that his attorney provided ineffective assistance when he failed to object to an in-court identification of Delacerda by Raul Rodriguez. (Docket Entry No. 1 at 11). Second, Delacerda claims that counsel was ineffective for failing to object to the trial court's lack of personal or subject matter jurisdiction over Delacerda because he was a juvenile at the time of the offense and because the transfer order from the juvenile court was "legally and factually insufficient." (*Id.*).

A failure to object does not constitute ineffective assistance of counsel if there is no sound basis for the objection. *See Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012). The Fifth Circuit

"has made clear that counsel is not required to make futile motions or objections." *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (citing *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (per curiam)).  The "failure to object . . . is generally a matter of trial strategy . . . which . . . will not [be] second guess[ed] . . . ." *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993).  Indeed, "deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed." *Thomas v. Thaler*, 520 F. App'x 276, 281 (5th Cir. 2013) (per curiam) (citing cases).

> a.  Failure to object to the in-court identification of Delacerda by Raul Rodriguez.

Delacerda asserts that the defense trial strategy was to contest the identification of Delacerda as the shooter.  (Docket Entry No. 1 at 4, 11).  Delacerda argues that trial counsel should have objected to the in-court identification made by Raul Rodriguez.  (*Id.* at 11).  Without providing further details, Delacerda simply states that the in-court identification resulted from an impermissible pre-trial identification procedure and prosecutorial misconduct.  (*Id.*).

During the state collateral proceeding, the judge made detailed findings about counsel's failure to object to Rodriguez's in-court identification of Delacerda.  (*See* Docket Entry No. 9-36 at 201–06).  Although the state habeas court found that counsel's failure to object to the in-court identification constituted deficient performance under *Strickland*, Delacerda did not meet the second *Strickland* prong of proving prejudice.  In reaching this conclusion, the court made the following relevant findings and conclusions:

**A.  Trial counsel should have objected to an impermissibly suggestive identification procedure that tainted the in-court identification of [Delacerda].**

1. At trial, the State called Raul Rodriguez as a witness.  At no time during the eleven (11) year period between the shooting and the arrest of [Delacerda] did Rodriguez identify [Delacerda] as the shooter.  In his sworn statement to police Rodriguez stated he did not see the person who fired the gun. (4RR 31).  At trial,

which occurred over 12 years after the shooting, Rodriguez identified [Delacerda] as the shooter.  (4RR 24, 35).

2.  During Rodriguez's testimony he disclosed that, during trial preparation, the prosecutor showed him a "different amount of pictures" and a photograph of [Delacerda] was one of them.  (4RR 35).

3.  Rodriguez identified [Delacerda] as the shooter during the trial in the above-styled case.

4.  [Delacerda]'s trial attorneys had no notice that Rodriguez was going to identify [Delacerda] as the shooter; nor did they know that prior to trial the prosecutor showed him a picture of their client for purposes of making an identification.  See RR4, p. 77, lines 16–23.

5.  Trial counsel failed to object or move to suppress the in-court identification.

6.  Generally, when attacking an in-court identification as being tainted by an impermissibly suggestive pretrial identification procedure, a motion to suppress the identification should be filed and a hearing should be held out of the jury's presence.  *Barley v. State*, 906 S.W.2d 27, 32 (Tex. Crim. App. 1995); *Wallace v. State*, 75 S.W. 3d 576, 584 (Tex. App.—Texarkana 2002, pet. granted), *aff'd on other grounds*, 106 S.W.3d 103 (Tex. Crim. App. 2003).

7.  Furthermore, in order to attack a possible in-court identification of a witness, before trial and prior to that witnesses' testimony, (at a pre-trial hearing) the defense would need to be given notice that there is, in fact, a witness who can identify the defendant as the perpetrator.

8.  Prior to trial, a defendant has a right to file pre-trial motions necessary in his/her defense; and have a hearing before the court.

9.  In the case at hand, [Delacerda]'s attorneys were unable to file a pretrial motion to suppress the in-court identification by Rodriguez because the prosecutor never told them that Rodriguez had, in fact, made a positive identification of their client that was going to be used against him at trial.

10.  When a defendant challenges an out-of-court identification, a trial court must look to the totality of the circumstances surrounding the identification to determine whether a procedure was so **unnecessarily suggestive and conducive to irreparable mistakes identification that the defendant was denied due process of law**.  *See Webb v. State*, 760 S.W.2d 263, 269, 272 (Tex. Crim. App. 1988).  The trial court must determine: (1) whether the identification procedure was impermissibly suggestive and (2) whether the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification.  *Barley*, 906 S.W.2d at

33.  Failure to complain about or object to the in-court identification amounts to a procedural default.  *Wallace*, 75 S.W. 3d at 584.

11.  **In this case, the prosecutor does not remember showing Rodriguez a photospread of the defendant and is, therefore, unable to explain just how it was conducted**.

12.  **Outside the presence of the jury, the prosecutor admitted that during the office identification procedure she remembered Rodriguez volunteered that he could "*identify this person*," and that Rodriguez volunteered "*that he had seen his face somewhere before*."  RR4, p. 78, lines 12–15**.

13.  **The record is clear, Rodriguez testified that many years ago he had seen [Delacerda] at school some time prior to the murder**.

14.  **The Court finds that what the prosecutor could actually remember about how she conducted the identification procedure with Rodriguez establishes that the Defense should have objected to the in-court identification and should have requested a hearing as a viable defense strategy**.

15.  When evaluating whether a defendant has satisfied the second prong of the admissibility test, the trial court must consider the factors enumerated in *Neil v. Biggers* to determine whether the suggestive procedure give rise to a **substantial likelihood of irreparable misidentification**.  *Neil*, 409 U.S. 188, 199 (1972). These five factors include: (1) the opportunity to view the criminal at the time of the crime; (2) the witnesses' degree of attention; (3) the accuracy of the witnesses' prior description of the criminal; (4) the level of certainty demonstrated by the witnesses at the confrontation; and (5) the length of time between the crime and confrontation. *Barley*, 906 S.W.2d at 34–35.

16.  Applying the first factor, the witness Raul Rodriguez's trial testimony showed he had little opportunity to get a good view of the shooter.  Under the second factor, Rodriguez's degree of attention was poor, as reflected in his statement to police that he did not see the person who fired the gun.  (4RR 31).  As a result, Rodriguez was never asked to view a lineup. (4RR 30).  With respect to the third and fourth factors, Rodriguez's claim that [Delacerda] went to his middle school was inaccurate because [Delacerda] did not attend Edison Middle School with Rodriguez.  (7RR 49).  Finally, there was a 12-year lapse of time between the shooting and the identification procedure.

17.  **The Court is uncertain that Rodriguez's identification of [Delacerda] was based on his own independent, untainted personal knowledge; instead, the Court draws a reasonable inference that his identification was tainted by the prosecutor's presentation of the photograph to Rodriguez since the only thing the prosecutor remembered was that Rodriguez said – "*that he had seen his***

*face somewhere before*" – and that, '*this is the shooter*.'  *See Loserth v. State*, 985 S.W.2d 536 (Tex. App.—San Antonio 1998, pet ref'd).

18.   Because the identification procedure was impermissibly suggestive and application of the five factors weigh in favor of irreparable misidentification, there is a strong likelihood that an objection to the in-court identification of [Delacerda] would have been successful.

19.   By failing to object, trial counsel also procedurally defaulted on the opportunity to suppress the identification.  It was objectively unreasonable and, thus, deficient for trial counsel to fail to move for suppression of the identification.  *See Cooke v. State*, 735 S.W.2d 928, 930 (Tex. App.—Houston [14th Dist.] 1987, pet ref'd).

20.   Trial counsel's purported strategy of impeaching the witness over his identification of [Delacerda], in lieu of moving to suppress the identification resulting from an impermissibly suggestive identification procedure, was professionally unreasonable, thereby satisfying *Strickland's* first prong.  *See United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020) citing *Simmons v. United States*, 390 U.S. 377, 384 (1968).

21.   The "prejudice" prong of *Strickland* requires this Court to determine whether trial counsel's deficient conduct was sufficient to undermine its confidence in the verdict.  *Strickland v. Washington*, 466 U.S. at 668, 687 (1984); *Kyles v. Whitley*, 514 U.S. 430; *see also Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) (the Applicant is not required to show there would have been a different result).  In determining whether [Delacerda] has met his burden, this Court need not require him to show that he would have been acquitted but for counsel's errors.  *Everage v. State*, 893 S.W.2d 219, 222 (Tex. App.—Houston [1st Dist.] 1995, pet ref'd).

22.   Although trial counsel did not object to the in-court identification and request a hearing, this in and of itself, is not the only evidence to establish confidence in the jury's verdict.

23.   Emily Hugo testified that she saw [Delacerda] pull a gun from his waistband, point it out of the window and start shooting.  5RR, pp. 223–225.

24.   Based on the foregoing, [Delacerda] fails to meet the 2nd prong of Strickland to establish that counsel's performance was so deficient that it undermines confidence in the jury's verdict.

(Docket Entry No. 9-36 at 201–06).

The trial record supports the state habeas court's findings that Delacerda was not prejudiced by Rodriguez's testimony.  Carlos Martinez, David Cruz, and Emily Hugo—three individuals who

were also in the truck when Robert Contreas was shot—identified Delacerda as the shooter.[2] (*See* Docket Entry No. 9-2 at 116–19, 141–45, 190–92). Hugo, in particular, was sitting directly next to Delacerda in the cab of the truck when he started shooting the gun. (*Id.* at 190–92). Delacerda cannot show that there is a reasonable probability that, but for his counsel's alleged error in objecting to the in-court identification by Rodriguez of Delacerda as the gunman, the result of the proceeding would have been different. Instead, the jury could easily have relied on the testimony of Hugo, Martinez, or Cruz to reach its verdict.

The state habeas court considered Delacerda's arguments, made credibility determinations based on the evidence and its review of the trial proceedings, applied the *Strickland* analysis to the facts it found credible, and concluded that Delacerda had failed to demonstrate actual prejudice as a result of his attorney's failure to object to the in-court identification. Delacerda has not pointed to any clear and convincing evidence to show that the state habeas court's factual findings were unreasonable in light of the evidence presented at trial, nor has he shown that the state habeas court's application of *Strickland* to the facts was objectively unreasonable. Delacerda has not carried his burden of proof and is not entitled to federal habeas relief on this claim.

      b.    <u>Failed to object to the trial court's lack of personal or subject matter jurisdiction</u>.

Delacerda asserts that trial counsel was ineffective for failing to object to the district court's lack of personal or subject matter jurisdiction over the criminal case. (Docket Entry No. 1 at 11). He claims that the district court did not have jurisdiction because he was a juvenile when the offense occurred and because the juvenile court's transfer order was legally and factually insufficient. (*Id.*).

---

[2] Tommy Barron, who was also in the pickup truck, did not testify at trial. Barron had died in approximately 2001. (*See* Docket Entry No. 9-2 at 118).

In rejecting this claim on state habeas review, the court made the following relevant findings:

## PROCEDURAL POSTURE & FINDINGS OF FACT

1. On January 21, 1997, Jesus Roberto Contreras was shot and killed.

2. On January 25, 2008, [Delacerda] was arrested for the murder of Jesus Contreras and placed in the Harris County Jail.

3. Eleven years transpired from the date Contreras was killed and the date [Delacerda] was arrested.

. . . .

5. [Delacerda] was sixteen (16) years of age at the time Contreras was killed.

6. At the time of [Delacerda]'s arrest, he was twenty-seven (27) years of age.

7. On January 25, 2008, petition #200800681J was filed in the 313th District (Juvenile) Court, Harris County, Texas alleging [Delacerda] engaged in delinquent conduct by intentionally and knowingly causing the death of Jesus Contreras by shooting the complainant with a deadly weapon, namely: a firearm, and or did unlawfully intend to cause serious bodily injury to Jesus Contreras and did cause the death of Contreras by intentionally or knowingly committing an act clearly dangerous to human life by shooting the complainant with a deadly weapon, namely: a firearm.

8. On January 30, 2008, [Delacerda] received a summons by the State notifying him of the State's intent to hold a hearing before the 313th District Court for the purpose of the court waiving jurisdiction and transferring the case to the criminal district court.

. . .

10. On March 11, 2008, the juvenile court held a certification hearing with all necessary parties present.

11. On March 11, 2008, at the time of his certification hearing, [Delacerda] was twenty-seven (27) years old.

12. On March 12, 2008, the court signed an order to waive its jurisdiction after considering, among other matters:

     (1)    *whether the alleged murder was against person or property, with the greater weight in favor of waiver given to offenses against the person;*

     (2)    *the sophistication and maturity of the child;*

     (3)    *the record and previous history of the child; and*

     (4)    *the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services and facilities currently available to the Juvenile Court.*

13. After considering the foregoing factors, the court concluded that because there was probable cause to believe the child committed the murder and because of the seriousness of the murder, the welfare of the community required criminal proceedings.

14. Thus, the juvenile court transferred [Delacerda]'s case to the 174th Criminal District Court, Harris County, Texas.

15. On March 12, 2008, the 174th District Court assumed jurisdiction of the case after signing an order stating such; however, the printed name of the judge signing the order was not on the document nor was the date of the judge's signature.

16. On August 24, 2009, the 232nd District Court Grand Jury indicted [Delacerda] for Murder, and the case proceeded as cause number 1229727, *The State of Texas vs. Rogelio Delacerda* in the 174th Criminal District Court for final disposition.

. . .

18. On October 29, 2009, [Delacerda] was found guilty by a jury and assessed punishment.

. . .

**F.  [Delacerda]'s appellate counsel's performance was not deficient by not challenging the juvenile court's certification of [Delacerda] and its waiver of jurisdiction.**

1. The Court finds, based on the credible affidavit of Geraldo Acosta that Acosta has limited recollection of this case.  *See September 7, 2018 affidavit of Geraldo Acosta.*

2. The Court finds, based on the credible affidavit of Geraldo Acosta, that Acosta recalls that [Delacerda] wished to waive certification in order to be transferred to

adult court so he could receive a bond. *See September 7, 2018 affidavit of Geraldo Acosta*.

3.  The Court finds, based on the credible affidavit of Geraldo Acosta that Acosta would not have challenged the order of the district court's jurisdiction because it would have undermined the wishes of his client. *See September 7, 2018 affidavit of Geraldo Acosta*.

4.  The Court finds that trial counsel did not act in an objectively deficient manner for not challenging the sufficiency of the evidence or the specificity of the order supporting the waiver of the juvenile court's jurisdiction.

5.  [Delacerda] fails to show his trial counsel was deficient in failing to challenge the order waiving jurisdiction as defective or void.

6.  [Delacerda] fails to show his trial counsel was deficient in failing to challenge the district court's jurisdiction.

7.  On March 22, 2010, Leah Borg filed an appellate brief on [Delacerda]'s behalf which presented twelve points of error, including the complaint that the trial court lacked jurisdiction because of an invalid order assuming jurisdiction from the juvenile court.

8.  On July 21, 2011, the First Court of Appeals overruled the jurisdictional complaint along with the remaining points of error and affirmed the trial court's judgment.

9.  The affidavit of Leah M. Borg reflects that she believed there was sufficient evidence to justify the juvenile court's waiver of jurisdiction; and, that Borg did not believe that there was sufficient evidence to invalidate the juvenile court's order waiving jurisdiction given the evidence presented to the juvenile court.

10.  The Court finds, based on a review of the First Court of Appeals opinion, that Leah M. Borg challenged the trial court's jurisdiction based on an invalid transfer order in the first point of error and this complaint was rejected by the Court of Appeals. *Delacerda v. State*, 425 S.W.3d at 378–80.

11.  The Court finds, based on the credible affidavit of Leah M. Borg, that Borg did not challenge the sufficiency of the evidence supporting the juvenile court's waiver of jurisdiction because she believed there was sufficient evidence to support the waiver.

12.  The Court finds, based on the credible affidavit of Leah Borg, that Borg did not act in an objectively deficient manner for not challenging the sufficiency of the evidence and the specificity of the order supporting the waiver of the juvenile court's jurisdiction.

**VI.  The judgment of the criminal district court is not void for lack of personal or subject matter jurisdiction.**

1.  The fact that the 174th District Court's order (*assuming jurisdiction of the criminal proceedings*) did not have a printed signature of the judge and the date of the order was signed does not result in the court lacking jurisdiction.  *See*, *Delacerda v. State*, 425 S.W.3d 380 (Tex. App.—Houston [1st Dist. 2011).

2.  Neither the Family Code nor the Code of Criminal Procedure specifies the required contents of the district court's order assuming jurisdiction, and neither code specifies that, if that order does not meet certain requirements, the trial court loses jurisdiction.  *Id.* at 380.

3.  The Court of Appeals in *Delacerda* concluded that despite the lack of a date and printed name of the judge, the order in question unequivocally provides for the assumption of jurisdiction by the 174 District Court.  *Id.*

**G.  Trial counsel need not have objected to the juvenile court's order waiving jurisdiction as insufficient.**

1.  The Court of Criminal Appeals recently overruled its decision in *Moon* that required the order waiving jurisdiction to have increased factual detail beyond that required by statute.  *Ex Parte Thomas*[,] 623 S.W.3d 370 (Tex. Crim. App. Mar. 31, 2021), reh'g denied (June 23, 2021) (overruling *Moon v. State*, 451 S.W.3d 28 (Tex. Crim. App. 2014)).

2.  *Thomas* holds that the requirement created by *Moon* for specific fact-findings in the transfer order are not supported by the text of the governing statute.  *Thomas* at 377.

3.  The statutory scheme directs the juvenile court to state the reasons for the waiver set out in the statute.  *Id.* at 379.

4.  In the instant case, the juvenile court appropriately detailed reasons for transfer as set out by the statute, making the transfer valid.  *See id.* at 383.

(Docket Entry No. 9-36 at 195–97, 230–32).

The trial record supports the state habeas court's finding that appellate counsel was not deficient by not challenging the juvenile court's waiver of jurisdiction, that trial counsel need not have objected to the juvenile court's order waiving jurisdiction as insufficient, and the judgment of the district court was not void for lack of personal or subject matter jurisdiction.  The record

shows that the state habeas court considered Delacerda's arguments, made credibility determinations based on the evidence and its review of the trial proceedings (including the decision from the First Court of Appeals), applied the *Strickland* analysis to the facts it found credible, and concluded that Delacerda had failed to demonstrate either deficient performance or actual prejudice. Delacerda has not directed this court to any clear and convincing evidence sufficient to rebut the presumption that the state habeas court's findings are correct, nor has he shown that the state habeas court's application of *Strickland* to the facts was objectively unreasonable. Delacerda has therefore failed to carry his burden of proof, and he is not entitled to federal habeas relief on this claim.

> 3. *The Claim of Counsel's Failure to Call Witnesses and Conduct an Investigation of Delacerda's Background or Present Mitigation Evidence of His Family and Employment History During the Punishment Phase of Trial*

Delacerda argues that his attorney rendered ineffective assistance during the punishment phase of trial when the attorney failed to offer testimony of several character/mitigation witnesses who were available, able to, and willing to testify and instead presented only one witness (Delacerda's wife). Along the same lines, Delacerda asserts that his attorney failed to conduct an investigation into his background or present mitigation evidence of his family and employment history during the punishment phase. (Docket Entry No. 1 at 12).

During the state collateral proceeding, Delacerda supported this claim by submitting affidavits from his father (Rodolfo Delacerda), brother-in-law (Orlando Rodriguez), two cousins (Julio Alderete and Maria Gonzales), an ex-uncle-in-law (George Stefanakis), an ex-sister-in-law's mother (Delfina Vega), an employer (Ben Barlow), and two childhood friends (Julio Hernandez and Alejandro Martin). (*See* Docket Entry No. 9-34 at 8–24). In their affidavits, these individuals

generally stated that Delacerda is a hard worker, is a non-violent and good person, and has a good relationship with his family and friends. (*See id.*).

The state habeas judge made detailed findings on this claim. (*See* Docket Entry No. 9-36 at 216–29). Although the state habeas court found that counsel's failure to investigate the basis of Delacerda's mitigation defense fell below the professional norms of reasonableness and thus was constitutionally deficient, the state court further found that Delacerda did not meet the second *Strickland* prong of proving prejudice. In reaching this conclusion, the court made the following relevant findings and conclusions:

### D.    The First Prong Analysis – Trial Counsel's failure to conduct an independent investigation and present mitigation evidence.

1.  At the punishment phase of trial, after the State called five (5) witnesses, trial counsel called a single witness ([Delacerda]'s wife) to testify in mitigation of punishment. (10RR. 57-61).

2.  The State's punishment witnesses testified mostly concerning the effect of the complainant's death on his family members. See RR.

3.  During punishment, the State presented no evidence of [Delacerda] having a criminal conviction. *See* RR.

4.  The State presented evidence during the punishment phase of trial establishing that [Delacerda] had a tattoo symbolizing Latin Kings gang membership in the year of 2002 – long after the murder of the complainant. *See* RR Vol. 10 pp. 76–77.

5.  The Defense presented no evidence during punishment to counter the State's evidence that [Delacerda] was not in the Latin Kings in 2002. *See* RR.

6.  The Court finds that, other than the fact that the jury found [Delacerda] murdered the complainant by shooting him, the only other serious aggravating punishment evidence was [Delacerda]'s continued association, in 2002, with an internationally known violent street gang (Latin Kings) despite his testimony that he had left the gang by the time he had fled to Mexico.

7.  The Court finds that there was no evidence of any investigation to determine punishment mitigation despite Attorney[] Acosta['s] affidavit stating that his brother helped with the investigation before and during trial, and that he had interviewed persons regarding events leading up to and during the shooting.

8.  The Court finds that there was no evidence of any investigation to determine punishment mitigation despite Attorney[] Acosta['s] affidavit stating that he would have also interviewed anyone his client suggested.

9.  The Court finds there was no evidence presented to establish that the State had any specific prior bad acts (gang related or otherwise) of [Delacerda] to use to cross examine any potential Defense character witness regarding the witness's knowledge of [Delacerda]'s character or conduct.

10.  The Court finds, in fact, the State's cross-examination of [Delacerda]'s wife failed to reveal any evidence of prior bad acts of [Delacerda] specifically related to any gang activity.

11.  The Court finds speculative the allegation that the State would use prior bad acts against [Delacerda] had Defense called witnesses during the punishment phase of trial.

12.  The Court finds that character evidence during the punishment phase of trial was viewed by Defense as rarely effective at influencing punishment; *See, Affidavit of Attorney Cornelius*; however, the Court finds that omitting character evidence absolutely prevents the opportunity for the jury to determine that the character evidence was, in fact, mitigating.

13.  Nine (9) witnesses were available to testify on [Delacerda]'s behalf at the punishment stage of his trial but were neither interviewed nor called by counsel on [Delacerda]'s behalf.  *See, Affidavits*.  These witnesses included [Delacerda]'s co-workers, relatives, and friends.  All were aware that [Delacerda] had been convicted of murder but were still willing to testify on his behalf at the punishment stage. These people painted a compelling portrait of [Delacerda] as a good, kind, decent, and caring man who was not a danger or threat to the safety of the community and a man for whom they would have asked the court to assess a minimal prison sentence by tempering justice with mercy.

14.  Trial counsel did not seek out, interview, or secure the appearance of any witnesses in mitigation of punishment outside of [Delacerda]'s wife.  *See, Affidavit of Geraldo G. Acosta*.

15.  Trial counsel opined that ". . . purely character witnesses, specifically friends or family, are rarely, if ever, effective at influencing a jury at punishment in a murder case. . ."  *See, Affidavit of R.P. Cornelius*.

16.  Trial counsel's concern that calling character witnesses at the punishment phase would have allowed the prosecution to introduce evidence of prior bad acts is rank speculation and unfounded.  Trial counsel has not identified any bad act evidence that could have been introduced.

17. The testimony of [Delacerda]'s wife, who was the sole punishment witness, did not result in the introduction of any evidence of prior bad acts.

18. [Delacerda] had already testified at the guilt-innocence phase, which did not result in the introduction of evidence of prior bad acts.

19. Each of these nine (9) witnesses were available and willing to testify at [Delacerda]'s trial. But for counsel's failure to seek out, interview, or secure the appearance of witnesses, these witnesses would have provided material evidence in mitigation of punishment.

20. In *Strickland v. Washington*, the Supreme Court addressed the appropriate federal constitutional standard to determine whether counsel rendered reasonably effective assistance. The defendant must first show that counsel's performance was deficient; and counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense; because counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result. *See also Wiggins v. Smith*, 539 U.S. 510 (2003).

21. In *Wiggins*, the United States Supreme Court recognized that an attorney's failure to present mitigating evidence at sentencing is not a reasonable tactical decision where counsel has not fulfilled his obligation to conduct a thorough investigation of the defendant's background. 539 U.S. at 522.

22. When assessing the reasonableness of an attorney's investigation, a court considers not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Id.* at 527. Strategic choices, made after less than complete investigation, are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *See id.* at 521.

23. The applicant must identify specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. Ultimately, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

24. An applicant need not show that counsel's deficient performance more likely than not altered the outcome of the case. *See id.* Rather, the issue is whether he received a fair trial resulting in a verdict worthy of confidence. *Cf. Kyles v. Whitley*, 514 U.S. 419 (1995).

25. In a bifurcated trial, the prejudice can be at either the guilt-innocence phase or the punishment phase of the trial. *Strickland*, 466 U.S. at 668; *Hernandez v. State*, 988 S.W.2d 770, 771–73 (Tex. Crim. App. 1999).

26. In the punishment phase, to assess prejudice, the evidence in aggravation is reweighed against the totality of available mitigating evidence as indicated by the record as a whole. *Wiggins*, 539 U.S. at 534. It is then determined if the sentence given was significantly more harsh than one that might have been given in the absence of counsel's deficient performance. *Miller v. Dretke*, 420 F.3d 356, 365 (5th Cir. 2005).

27. In making this determination, a reviewing court looks to the minimum and maximum sentence possible, the actual sentence handed down by the judge or jury, and all aggravating and mitigated evidence available. *Id.*

28. Defense counsel had the professional responsibility to seek out and interview potential witnesses.

29. Defense counsel's failure to interview and call witnesses who are available to testify and whose testimony would have been beneficial to the defendant is not strategic because counsel can only make a reasonable decision to forego calling such witnesses after evaluating their testimony and determining that it would not be helpful. *Milburn v. State*, 15 S.W.3d at 270.

30. Investigations into mitigating evidence should include efforts to discover all reasonable mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor. *Wiggins v. Smith*, 539 U.S. at 524. A trial attorney's complete failure to investigate potential mitigation evidence can *never* constitute reasonable trial strategy. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (emphasis added).

31. Defense counsel Acosta did not conduct an independent investigation in mitigation of sentencing; and as such, evidence was not evaluated to determine if it would be helpful for mitigation. *See Milburn* at 270. Instead, he merely asserts that [Delacerda] did not provide him the names of character witnesses.

32. Relying upon the defendant and/or his family to do the mitigation investigation has been found deficient under the first prong of *Strickland*. *Ex Parte Garza*, 620 S.W.3d 801, 823–24 (Tex. Crim. App. 2021).

33. Defense counsel's attempt to excuse their failure to investigate by making self-serving assertions that the testimony of these witnesses would not have been helpful. Courts have routinely rejected such *post-hoc* rationalization for failure to conduct a proper investigation. *See Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009).

34.   Specifically, defense counsel's assertion that the testimony of friends and family is not helpful at the punishment phase has been expressly rejected. *Milburn*, 15 S.W.3d at 270.

35.   Defense counsel's abdication of his duty to interview and, let alone, call witnesses who were ready, willing, and available to testify for [Delacerda] during the punishment stage was objectively deficient conduct that was not the result of any reasoned trial strategy. *See Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir. 1990) ("a decision to interview a potential witness is not a decision related to trial strategy; rather, it is a decision related to adequate preparation for trial."); *Moore v. State*, 983 S.W.2d 15, [24 –32] (Tex. App.—Houston [14th Dist.] 1998, no pet.) (Counsel's failure to interview and call witnesses who were available and whose testimony would have benefitted defendant at punishment phase was objectively deficient conduct); *Milburn v. State*, 15 S.W.3d at 270 (same).

36.   The sentencing stage of any case, regardless of the potential punishment, is the time for which for many defendants the most important services of the entire proceeding can be performed.  Where the potential punishment is life imprisonment . . . the sentencing proceeding takes on added importance. *Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983).  "Counsel must make a significant effort, based on *reasonable investigation and logical argument*, to mitigate his client's punishment." *Patrasso v. Nelson*, 121 F.3d 297, 303–04 (7th Cir. 1997) (emphasis added).

37.   Counsel had an ethical and professional duty to "present all available evidence and arguments to support the defense of [Applicant]." *Jackson v. State*, 857 S.W.2d 678, 683 (Tex. App.—Houston [14th Dist.] 1993).  This professional and ethical responsibility encompasses the duty to locate, interview, and call potential witnesses, and failure to do so constitutes ineffective assistance of counsel.  *Ex parte Welborn*, 785 S.W.2d at 395; *Milburn v. State*, 15 S.W.3d at 270; *Shanklin v. State*, 190 S.W. 3d at 165–66.

38.   The Supreme Court has recognized that "a failure to uncover and present mitigation evidence cannot be justified as a tactical decision when defense counsel has not conducted a thorough search of the defendant's background." *Wiggins v. Smith*, 539 U.S. at 521.

39.   Texas courts have reaffirmed this mandate in holding that the failure to interview and call witnesses who are available to testify at the punishment stage and whose testimony would have been beneficial to the defendant cannot be sanctioned as "strategic,["] and is deficient under *Strickland*, because counsel can make a reasonable decision to forego calling such witnesses only after evaluating their testimony and determining that it would not be helpful.  *See Ex Parte West*, 2016 WL 9000801 (Tex. Crim. App. June 8, 2016) (not designated for publication); *Milburn v. State*, 15 S.W.3d at 270.

40. All these people knew that [Delacerda] had been convicted of murder, yet all of them were still ready, willing, and able to testify on [Delacerda]'s behalf. Moreover, it is uncontradicted that none of them were ever contacted by [Delacerda]'s lawyer. Trial counsel's abdication of his duty to call, let alone interview witnesses who were ready, willing, and available to testify for [Delacerda] at the punishment stage of his trial, was objectively deficient conduct that could not be the result of any reasoned trial strategy.

41. The failure to uncover and present a wealth of mitigating evidence available cannot be justified as a "tactical" decision where, as here, it was informed by an unreasonable, indeed, non-existent investigation. *See Lair v. State*, 265 S.W.3d 580, 595 (Tex. App.—Houston [1st Dist.] 2008) ("*Counsel is ineffective when he fails to investigate and interview potential punishment witnesses, despite their availability and willingness to testify on [the defendant's] behalf*); *Shanklin v. State*, 190 S.W.3d at 164 ("*a failure to uncover and present mitigating evidence cannot be justified as a tactical decision when defense counsel has not conducted a thorough investigation of the defendant's background*"); *Moore v. State*, 983 S.W.2d 15, 23–24 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (*counsel's failure to interview and call available witnesses whose testimony would have benefitted defendant at the punishment stage was objectively deficient*); *Milburn v. State*, 15 S.W.3d at 270 (same); *Strickland v. Washington*, 466 U.S. at 693.

42. Some of the facts of this case are similar to *Milburn v. State*, 15 S.W.3d at 270–71, where defense counsel failed to interview and call 20 punishment witnesses who were available to testify on the defendant's behalf. The Court of Appeals rejected the State's claim that the failure to interview witnesses is a matter of trial strategy and held that there was a reasonable probability that the defendant's sentence would have been less severe had defense counsel presented that body of available mitigating evidence to balance the aggravating factors presented by the State. *Id.*

43. It is objectively unreasonable for trial counsel not to call witnesses at the punishment phase by giving an opinion that friends and family are not effective witnesses. *See Milburn*, 15 S.W.3d at 269–70; *Ex Parte West*, *supra*.

44. The witnesses in the case at bar would have enhanced the testimony of [Delacerda]'s wife and further humanized [Delacerda] in the eyes of the jury on the strength of what he had done to make their lives better.

45. The affidavits paint a picture of [Delacerda] that jurors never got a chance to see—a consensus from a group of people from the community that would swear to [Delacerda]'s standing as a loving father, hard worker, and leader on his job.

46. The Court finds Defense Counsel should have conducted an investigation to discover mitigating evidence and that such an investigation would have likely

revealed evidence that family, friends, co-workers, and supervisors were willing to testify that [Delacerda] was a hard worker, loving father, and a leader on the job.

47.  The Court finds defense counsel's decision to forego calling any punishment witnesses, other than [Delacerda]'s wife, was not reasonably made because no mitigation investigation had been conducted to determine what type of mitigation was available, and then no evaluation was ever conducted to determine the helpfulness it would have towards countering any aggravating evidence.  *See*, *Milburn*.

48.  Defense counsel's failure to investigate the basis of his client's mitigation defense fell below the professional norm of reasonableness.

**E.  The Second Prong Analysis**

49.  The sentencing process consists of weighing mitigating and aggravating factors, and making adjustments in the severity of the sentence consistent with the calculus.  *Milburn* at 270 *citing Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983), cert. denied, 464 U.S. 1053, 965, 104 S. Ct. 736, 79 L.Ed.2d 195 (1984).

50.  The Court finds that during the punishment phase of trial, the State's punishment evidence consisted of the State's witnesses testifying about the complainant and his good character.

51.  The Court finds that during the punishment phase of trial, the State cross-examined the Defense's only witness to establish that [Delacerda] was moving from job to job trying to hide and prevent his apprehension.

52.  The Court finds that during the punishment phase of trial, the jury also had as evidence the fact that [Delacerda] violently killed the complainant without any provocation from the complainant.

53.  The Court finds that a reasonable inference can be drawn that several of the [Delacerda]'s potential witnesses (employers, supervisors, co-workers) had worked with [Delacerda] for more than a short period of time seeing that several had formed opinions concerning his good work ethic and being a good family man.  Thus, corroborating his wife's testimony.  *See, Affidavit of Ben Barlow, et. al*.

54.  The Court finds that the foregoing evidence by [Delacerda]'s potential witnesses would have provided some counterweight to evidence elicited by the State during cross-examination of [Delacerda]'s wife.

55.  The Court finds that [Delacerda]'s witnesses whom would have been available to testify would have been able to enhance the wife's testimony that [Delacerda] was a good father and hard-working.

56.  The Court finds that during the guilt and innocence phase of trial the State elicited evidence that [Delacerda] was in a gang and that his involvement in the gang extended past the date of the complainant's murder—into, at least, the year of 2002.

57.  In assessing prejudice, this Court must juxtapose the evidence presented at trial by the defense with the mitigating evidence that could have bene presented to see if it paints a dramatically different picture of [Delacerda].  *Williams v. Taylor*, 529 U.S. 362, 397–38 (2000).

58.  The habeas evidence is definitely substantially greater in the number of available witnesses and is more compelling than the mediocre testimony provided by just one witness at the punishment phase.  *See Ex Parte Gonzalez*, 204 S.W.3d 391 (Tex. Crim. App. 2006).

59.  However, the punishment testimony of [Delacerda]'s wife and of the potential witnesses' is very similar.  They all essentially state the same thing, *that is, [Delacerda] was a good father and hard worker*.  Also, they all never spoke of *[Delacerda] being in trouble with authorities prior to or after the murder*.

60.  As such, the evidence and arguments at the punishment phase of trial would not have been significantly different from the mitigating evidence proffered in this [Delacerda]'s habeas case.

61.  The Court does not find the mitigating evidence that was not presented at the punishment stage of trial to have painted a dramatically different picture of [Delacerda].

62.  As such, the Court does not find that had the evidence been presented at trial the jury would have likely rendered a less severe sentence for [Delacerda].

63.  The Court finds that the lack of such evidence does not undermine confidence in the jury's verdict.

64.  Moreover, the Court finds that during closing arguments, at the punishment phase, the State asked the jury to sentence [Delacerda] to prison for fifty (50) years and the Defense remained silent as to their request.

65.  The Court finds that the jury rejected the State's request and determined that the evidence warranted fifteen (15) years less time in prison.

66.  The Court also finds that the jury's verdict is not undermined by lack of the Defense presenting very similar, cumulative, mitigating evidence (*although the accumulation of similar evidence could be considered more persuasive than a single witness's testimony*) because the jury set punishment well below the State's request for fifty (50) years in prison.

**67.  Therefore, [Delacerda] fails to establish the second prong of *Strickland* to establish that he was prejudiced by his attorney's performance**.

(Docket Entry No. 9-36 at 216–29).

When a petitioner alleges ineffective assistance of counsel in a non-capital sentencing context, a reviewing court must determine whether there is a reasonable probability that but for trial counsel's errors, the petitioner's sentence would have been significantly less harsh.  *See Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993); *Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005).  When assessing the prejudice caused by counsel's failure to present potentially mitigating evidence, the Fifth Circuit instructs the federal habeas court to "reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Miller*, 420 F.3d at 364 (citation omitted).  In doing so, a court may consider: (1) the actual amount of the sentence imposed; (2) the minimum and maximum sentences possible under the relevant statute or sentencing guidelines; (3) the relative placement of the sentence actually imposed within that range; (4) and the various relevant mitigating and aggravating factors that were properly considered by the sentencer.  *Id.* at 365.

Here, assuming that trial counsel's representation was deficient for failing to interview and call the identified witnesses and for failing to investigate and present other mitigating evidence about Delacerda's family and employment history, Delacerda is still not entitled to relief because the state court's decision that he failed to establish prejudice under *Strickland* was not an unreasonable application of clearly established federal law.  Delacerda was sentenced to 35 years in prison for one count of murder.  The  maximum sentence was life in prison and the minimum sentence was five years in prison.  *See* Tex. Penal Code Ann. § 19.02; Tex. Penal Code Ann. § 12.32.  Delacerda received a 35-year sentence, which was well below the 50-year sentence the State asked the jury to impose.  During trial, the jury heard evidence that Delacerda violently killed

Robert Contreas without any provocation from Contreas.  During the punishment phase, the jury heard evidence that Delacerda was in a gang and that his involvement in the gang extended past the date of Contreas's murder.  During cross examination of Delacerda's wife, the jury heard evidence that Delacerda was moving from job to job trying to hide and prevent apprehension, and that when he met his wife, he was using an alias.  The state habeas court found that although the affidavits from Delacerda's friends and family would have enhanced the testimony of Delacerda's wife that he was a good father and a hard-working man, the evidence presented in the affidavits during the state habeas proceeding would not have been significantly different from the mitigating evidence presented at trial.  Even if the evidence from the affidavits had been presented at trial, it was not likely that the jury would have imposed a less severe sentence.

The Court of Criminal Appeals denied this ground for review on the findings of trial court after hearing and on the court's independent review of the record.  The question on federal habeas review is not whether this court "'believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'"  *Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007)).

In this case, the mitigating factors were relatively minor when compared to the significant aggravating factor of Delacerda shooting Contreas, a teenager, without provocation.  There is not a reasonable probability Delacerda would have received a significantly less harsh sentence.  The Court of Criminal Appeals' conclusion on this point was therefore not unreasonable.  No basis for habeas relief is shown, and the respondent is entitled to dismissal of this claim.

**IV.**    **Certificate of Appealability**

Delacerda has not requested a certificate of appealability, but Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. *See* 28 U.S.C. § 2253. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To warrant a certificate of appealability as to claims denied on their merits, the petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack*, 529 U.S. at 484). When relief is denied based on procedural grounds, a petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that jurists of reason "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. A district court may deny a certificate of appealability on its own, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

After carefully considering the record, the court concludes that Delacerda has not met the requisite showing. There are no grounds to issue a certificate of appealability.

**V.      Conclusion**

Delacerda's petition for a writ of habeas corpus, Docket Entry No. 1, is dismissed with prejudice.  Any pending motions are denied as moot.  A certificate of appealability will not issue.  Final judgment is separately entered.

SIGNED on November 20, 2024, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge